**Vickie LESLEY, Plaintiff,**

v.

**Hee Man CHIE, M.D., Defendant.**

**No. Civ.A 97–40067–NMG.**

United States District Court,
D. Massachusetts.

Jan. 7, 2000.

Bennett H. Klien, Boston, MA, for plaintiff.

Robert V. Deiana, Margaret J. Hurley, Mirick, O'Connell, DeMallie & Lougee, Worcester, MA, for Hee Man Chie, defendant.

Claudia A. Hunter, Hunter & Walsh, Boston, MA, Lucie B. Dvorak, Hunter & Associates, P.C., Boston, MA, for HealthAlliance/Leominster Hosp., Leominster Hosp., defendants.

## MEMORANDUM & ORDER

GORTON, District Judge.

Plaintiff Vickie Lesley ("Lesley") brought this action against her former obstetrician/gynecologist, Defendant Hee Man Chie, M.D. ("Dr.Chie") and Defendants Health Alliance/Leominster and Leominster Hospital, alleging a violation of her civil rights under the Americans With Disabilities Act (Count I), the Rehabilitation Act of 1973 ("Rehabilitation Act") (Count II), and Massachusetts Public Accommodation Law (Count III). On February 12, 1999, Health Alliance/Leominster and Leominster Hospital were dismissed from the case with prejudice. On June 25, 1999, the parties stipulated to dismissal of Count I of the Amended Complaint. Pending before this Court is a Motion by Lesley for summary judgment on Counts II and III and a Cross Motion for summary judgment by Dr. Chie.

### I. Background

#### A. Lesley's Medical History

Dr. Chie, a board-certified obstetrician and gynecologist, operates a medical practice in Leominster, Massachusetts. He is a recipient of Medicaid program funding and in 1994 and 1995 was accepting new patients without restrictions except ability to pay. He is a member of the medical staff, with admitting privileges, at Leominster Hospital. Lesley has been Dr. Chie's patient since 1982. In December, 1994, Lesley became pregnant and went to Dr. Chie for prenatal care.

At Lesley's first prenatal appointment on December 15, 1994, Dr. Chie was or became aware of a number of complicating factors that made Lesley's pregnancy high-risk: (1) she was being treated for a severe psychiatric illness (manic depression, which may be exacerbated by pregnancy), (2) She was taking Lithium, Zoloft and Depakote for her manic depression (which increases the risk of birth defects), (3) she had a history of diabetes and (4) she had undergone a late-term abortion in 1994 and was at increased risk for cervical incompetence.[1] Dr. Chie planned to consult with other doctors about the complications when necessary.

On March 2, 1995, at a regularly scheduled prenatal appointment, Dr. Chie drew a blood sample for regular prenatal blood testing, including an HIV (Human Immunodeficiency Virus) test. He also ordered a fetal echocardiogram at Worcester Memorial Hospital ("Worcester Memorial") to check for any fetal heart abnormalities which might exist as a result of Lesley's Lithium usage.

---

1. Dr. Chie had treated only one other woman taking Lithium during pregnancy and had never treated a pregnant woman for diabetes insipidus. Lesley had a sensitivity to Lithium and Depakote that caused her to become toxic to those medications sooner than some other people.

On March 8 or 9, 1995, Dr. Chie learned that Lesley had tested positive for HIV and he informed her of such on March 9, 1995. At an appointment the next day with Lesley and her husband, Dr. Chie discussed with them the risk of transmission of HIV to her fetus. A week later, Lesley learned that a second test confirmed that she was HIV positive and a few days after that, Dr. Chie was informed of that result.

### B. HIV and Pregnancy

HIV, a virus which causes Acquired Immune Deficiency Syndrome ("AIDS"), may be transmitted from an infected mother to an infant during pregnancy or childbirth. In February, 1994, the results of Clinical Trials Group Study 076 showed that the risk of such transmission is significantly reduced when the mother takes the drug AZT. AZT therapy to reduce transmission of HIV to the fetus involves several stages: (1) The mother takes AZT orally during her pregnancy, (2) the mother is given AZT intravenously during labor and delivery and (3) the newborn infant is given AZT syrup after birth.[2]

In November, 1994, the Massachusetts Department of Public Health distributed a Clinical Advisory ("DPH Clinical Advisory") to all obstetricians in Massachusetts, setting forth dosages and guidelines for the administration of AZT during pregnancy and delivery. Dr. Chie received and read the DPH Clinical Advisory. In reference to the administration of oral AZT, the Advisory recommends "consultation with an internist, infectious disease specialist, or perinatologist knowledgeable about HIV disease in pregnancy."

As of March 30, 1995, Dr. Chie had never before prescribed AZT to a patient or monitored a patient receiving AZT for side-effects, including the prevention of transmission of HIV from a mother to her fetus. Although he had treated other HIV-positive women in his gynecological practice, he had never before provided prenatal or obstetrical care to an HIV-positive woman.

### C. Lesley's Transfer

After he learned of Lesley's second positive HIV test result, Dr. Chie immediately called the Leominster Hospital pharmacy to inquire whether it had AZT in its formulary to be given intravenously during labor. The pharmacy informed Dr. Chie that the drug was unavailable and that he would have to contact the Pharmaceutics & Therapy Committee (the "P & T Committee") for approval of intravenous AZT.[3]

Between March 20 and 30, 1995, Dr. Chie contacted Dr. Man, the Chairman of the P & T Committee at Leominster Hospital, to inform him that he needed intravenous AZT for a delivery at Leominster Hospital. Dr. Man assured him that he would bring it up at the next P & T Committee meeting for approval. On March 30, 1995, before an appointment scheduled with Lesley later that day at which he would transfer her care, Dr. Chie again contacted the Leominster Hospital pharmacy and learned that intravenous AZT was not yet available because it was still awaiting P & T Committee approval.

Dr. Chie also contacted Sheila Noone ("Nurse Noone"), the full-time coordinator of the Women and Infants HIV Program at Worcester Memorial Hospital ("Worcester HIV Program"), which provides counseling and medical care to HIV-positive pregnant women and their infants, including management of AZT therapy, to see

2. The woman should begin taking oral AZT in her 14th week of pregnancy and the infant's pediatrician is responsible for administering AZT syrup to a newborn.

3. At the time of Lesley's pregnancy, if a drug was not already in the Leominster Hospital pharmacy, a physician on staff at Leominster Hospital could obtain the drug for inpatient use by requesting that the P & T Committee approve the drug at its next meeting or by asking the Director of the Pharmacy to place a drug on the formulary on an emergency basis without P & T Committee authorization.

what the Worcester HIV Program could offer for Lesley.[4] Dr. Chie told her that he would search for a local obstetrician or primary care physician who had experience administering AZT, with whom he could consult, but that if he could not find such a doctor, he would refer Lesley to the Worcester HIV Program to begin the oral AZT phase of AZT therapy. Nurse Noone offered to act as a consultant if Dr. Chie decided not to transfer Lesley's care. She warned him that if he planned to treat Lesley, he had to be able to provide the entire treatment, both prenatal care and delivery.

Dr. Chie also contacted Lesley's primary care physician, Dr. Fraser, and was informed that he did not know of an AZT program at Leominster Hospital. Dr. Chie told Dr. Fraser that he would probably need to refer Lesley to Worcester Memorial, which would require Dr. Fraser's approval because he was her primary care physician. On March 30th, the day Dr. Chie transferred Lesley's care, Dr. Fraser told him he had not heard anything about the approval of intravenous AZT.

At an appointment with Lesley on March 20, 1995, Dr. Chie told her that he had never before prescribed AZT, that he did not know how to manage its side effects and that she should consider treatment by the Worcester HIV Program.

Lesley spoke with her psychiatrist, Dr. Lofgren, and he recommended that she seek treatment at a university hospital (such as Worcester Memorial), given the complications involved with her pregnancy, including HIV, diabetes, manic depressive disorder and the numerous risky medications she was taking.

On March 30, 1995, Dr. Chie performed a routine prenatal examination of Lesley. After the examination, he informed her that Leominster Hospital did not have an AZT program in place, that he had spoken to other local obstetricians and none of them had experience administering AZT, that he did not have confidence using AZT and that he thought it was in her best interest to transfer her care to Worcester Memorial.[5]

## II. Analysis

### A. Standard of Review

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990)). The burden is upon the moving party to show, based upon the pleadings, discovery on file and affidavits "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmovant may not, however, rest upon mere allegation or denial of the pleadings. Fed.R.Civ.P. 56(e). Establishing a genuine issue of material fact requires more than "effusive rhetoric and optimistic surmise." *Cadle Company v. Hayes*, 116 F.3d 957, 960 (1st Cir.1997). "If the evidence [raised in opposition to

4. In 1995, Worcester Memorial, including the Worcester HIV Program, had substantial experience using AZT to reduce the risk of the transmission of HIV to a fetus. It was one of eight medical centers nationally to participate in ATCG Protocol 076, upon which the DPH Clinical Advisory was based.

5. Three weeks later, Dr. Man distributed an educational memorandum to obstetricians at Leominster Hospital regarding the availability and use of AZT to reduce transmission of HIV to a fetus which stated: "We will make available to you and your patients the various forms of [AZT] for in-patient use." On April 26, 1995, intravenous AZT was delivered to Leominster Hospital in preparation for the delivery of an HIV-positive woman.

summary judgment] is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must view the record in the light most hospitable to the non-moving party and indulge all reasonable inferences in his favor. *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir.1993). On cross-motions for summary judgment, the court must consider each motion separately, "drawing inferences against each movant in turn." *Reich v. John Alden Life Ins.*, 126 F.3d 1, 6 (1st Cir.1997).

"Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citations omitted). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Anderson*, at 249–50, 106 S.Ct. at 2511.

**B. Count II: The Rehabilitation Act**

Section 504 of the Rehabilitation Act of 1973 provides that:

> No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794.

■ Under § 504 of the Rehabilitation Act of 1973, a plaintiff must prove four elements to establish a *prima facie* violation of the statute:

1) she is a handicapped person;

2) the relevant program or activity receives federal financial assistance;

3) she is "otherwise" qualified for participation in the program; and

4) she is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely by reason of her handicap.

*Doherty v. Southern College of Optometry*, 862 F.2d 570, 573 (6th Cir.1988).[6] The parties agree that Lesley qualifies as a disabled person under the Rehabilitation Act.

**1. Federal Financial Assistance**

■ The receipt of Medicare or Medicaid payments qualifies as receiving "federal financial assistance" under the Rehabilitation Act. *Glanz v. Vernick*, 756 F.Supp. 632, 636 (D.Mass.1991). "It is not necessary that federal funds be received for care and treatment of complaining plaintiff." *Sharrow v. Bailey*, 910 F.Supp. 187, 193 (M.D.Pa.1995).

Dr. Chie contends that Lesley cannot establish this element of her *prima facie* case because he was not in a position to accept or reject federal assistance on behalf of Leominster Hospital and thus, cannot be held liable for failing to obtain intravenous AZT therapy at Leominster Hospital. In reply, Lesley notes that she is not claiming that Dr. Chie failed to make intravenous AZT available at Leominster Hospital, but rather, that he ignored the Hospital's willingness to make it available.

Dr. Chie's receipt of Medicaid funds is sufficient to establish that he received "federal financial assistance" as required to state a claim under the Rehabilitation Act. This Court is unpersuaded by Dr. Chie's argument that he is not liable because he could not accept funds on behalf of Leominster Hospital. Lesley claims

---

**6.** Pub.L. No. 102–569 amended the statute to substitute the word "disability" for "handi- cap."

that the hospital was willing to make intravenous AZT available, and accepting her allegations as true, Dr. Chie's authority to accept federal funds on behalf of Leominster Hospital is irrelevant. Only his decision to transfer her care, given the availability of intravenous AZT at Leominster Hospital, is at issue.

### 2. "Otherwise Qualified"

 Under § 504, a person is "otherwise qualified" if she is "able to meet all the program's requirements in spite of her handicap." *Southeastern Community College v. Davis,* 442 U.S. 397, 406, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). In other words, the plaintiff must prove that if she were not handicapped, she would have qualified for the treatment she was denied because of her handicap. *See Grzan v. Charter Hosp. of Northwest Indiana,* 104 F.3d 116, 120 (7th Cir.1997). The defendant may rebut the plaintiff's contention by showing that the plaintiff's handicap made her unqualified. *See Glanz v. Vernick,* 756 F.Supp. 632, 638 (D.Mass.1991). Where a disabled person does not initially appear to be "otherwise qualified," it is necessary to consider whether that person would be "otherwise qualified" if given reasonable accommodation. *See Galloway v. Superior Court of D.C.,* 816 F.Supp. 12 (D.D.C.1993).

Several Circuit Courts of Appeals have held that a person is not "otherwise qualified," and therefore cannot establish a *prima facie* case, if her handicap is related to the medical treatment she seeks so that, absent her handicap, she would not require treatment in the first place. *See Grzan* 104 F.3d 116 (7th Cir.1997) (psychiatric patient who had sexual relationship with her counselor would not need treatment absent her disability); *Johnson v. Thompson,* 971 F.2d 1487, 1493–94 (10th Cir. 1992), *cert. denied,* 507 U.S. 910, 113 S.Ct. 1255, 122 L.Ed.2d 654 (1993) (infant with birth defects denied surgery was not otherwise qualified); *United States v. University Hosp. S.U.N.Y. at Stony Brook,* 729

F.2d 144, 156 (2nd Cir.1984) (refusal of parents of handicapped infant to consent to corrective surgery). The purpose of § 504 is to "assure evenhanded treatment; neither the language, purpose, nor history of § 504 reveals an intent to impose an affirmative-action obligation on recipients of federal financial assistance." *Bowen v. American Hospital Ass'n,* 476 U.S. 610, 640, 106 S.Ct. 2101, 90 L.Ed.2d 584 (1986) (plurality opinion) (citations omitted).

Dr. Chie contends that Lesley was not "otherwise qualified" for treatment because her disability (HIV seropositivity) was related to the medical condition for which she sought treatment (administration of AZT in connection with her prenatal care). He argues that because she cannot show that a non-HIV positive pregnant woman was entitled to receive AZT during labor and delivery, she cannot establish a *prima facie* case.

Here, even if Lesley were not HIV-positive, she would have still required prenatal and obstetrical care. It is not clear, however, that she was "otherwise qualified" for treatment *by Dr. Chie.* Although Dr. Chie planned to treat Lesley before he learned that she was HIV-positive despite her other complications, Lesley does not provide evidence that a decision by Dr. Chie to transfer her care on the basis of non-HIV related complications would have been medically inappropriate.

Although it is doubtful that Lesley, as a matter of law, is "otherwise qualified," it is not necessary to decide that question because Dr. Chie did not discriminate against her solely on the basis of her HIV-positive status.

### 2. "Discrimination Solely by Reason of Handicap"

 Under § 504, the discrimination must result "from the handicap and from the handicap alone." *Johnson* at 1493. "To establish a *prima facie* case, a plaintiff must show that he was rejected under circumstances which gave rise to the infer-

ence that his rejection was based solely on his handicap." *Pushkin v. Regents of the Univ. of Colorado,* 658 F.2d 1372, 1387 (10th Cir.1981).

■ Section 504 is not meant to apply to medical treatment decisions. *See Toney v. U.S. Healthcare, Inc.,* 840 F.Supp. 357, 361 (E.D.Pa.1993) (citing *University Hospital* at 160), *aff'd,* 37 F.3d 1489 (3rd Cir.1994).

> [I]n view of [the] consistent congressional policy against the involvement of federal personnel in medical treatment decisions, we cannot presume that congress intended to repeal its earlier announcements in the absence of clear evidence of congressional intent to do so ... [T]here is no such clear expression of congressional intent in either the language or legislative history of section 504.

*United States v. University Hospital,* 729 F.2d 144, 160 (2nd Cir.1984) (citation omitted). In *Glanz v. Vernick,* the court limited that principle somewhat, holding that while § 504 does not authorize the courts to override medical decisions, it "properly permits an inquiry into whether a medical decision is 'a *bona fide* medical judgment,' or whether handicap has improperly been taken into account." 750 F.Supp. 39, 46.

The rationale for giving deference to medical treatment decisions is:

> Beyond the fact that no two cases are likely to be the same, it would invariably require lengthy litigation primarily involving conflicting expert testimony to determine whether a decision ... was based on a "bona fide medical judgment," however that phrase might be defined ....

*University Hospital* at 157.

■ If the patient-plaintiff establishes a *prima facie* case, the burden shifts to the defendant who must show that rejection from the program was for reasons other than the patient's handicap. *See Pushkin*

at 1387. A physician's lack of skill or experience is a legitimate reason for transfer of medical care.

> Nothing in the ADA compels a health care provider to treat an individual who requires care beyond the provider's ability or expertise. A provider may refer an individual with a disability to another health care provider if, in the normal course of its operations, "the referring provider would make a similar referral for an individual without a disability . . . ."

*Howe v. Hull,* 873 F.Supp. 72, 78–79 (N.D.Ohio 1994) citing 28 C.F.R. § 36.302(b)(1).[7] The legislative history of the ADA provides that it is not purpose of the ADA to prevent a physician from transferring a patient's medical care where the disability "creates specialized complications for the patient's health which the physician lacks the experience or knowledge to address." H.R.Rep. No. 485, 101st Cong., 2nd Sess. 106.

Finally, the plaintiff has the opportunity to provide rebuttal evidence to prove that the reason given by the defendant is a pretext or that the reason "encompasses unjustified consideration of the handicap itself." *Glanz* at 638, citing *Pushkin* at 1387.

■ Lesley contends that Dr. Chie's termination of her care was based solely on the fact that she is HIV-positive. She argues that:

1) Dr. Chie was capable of administering AZT by obtaining a consult as he did in connection with her Lithium usage and diabetes,

2) Leominster Hospital was fully prepared and willing to provide the intravenous AZT necessary for labor and delivery on a timely basis, and

3) Dr. Chie did not terminate her care on the basis of other complications and

---

7. Although the cases cited involve ADA, not Rehabilitation Act claims, "the standards applicable to one act are applicable to the other." *Washington v. Indiana H.S. Athletic Ass'n.,* 181 F.3d 840, 845 (7th Cir.1999).

transferred her only after learning that she was HIV-positive.

In support of her arguments, Lesley provides the affidavit of Dr. Minkoff who states that no specialized knowledge is considered necessary to administer AZT or to provide prenatal care for women with HIV infection. The affidavit also asserts that there is no medical basis for a licensed practitioner of obstetrics to refer an HIV-positive pregnant woman to a high risk clinic for prenatal care based on HIV-positive status alone. Dr. Chie provides affidavits of four physicians who state that his decision to transfer Lesley's care was medically appropriate.

Lesley fails to show that Dr. Chie transferred her care solely because of her disability and thus she does not establish a *prima facie* case of discrimination. It is undisputed that:

1) Lesley had numerous complications associated with her pregnancy other than HIV seropositivity including: a) severe psychiatric disorder (manic depression), b) the use of medication which created an increased risk of birth defects, c) increased risk of cervical incompetence due to a late-term abortion and d) diabetes,

2) Dr. Chie had never treated an HIV-positive pregnant woman and had never administered AZT or monitored its side effects,

3) Worcester Memorial, including the Worcester HIV Program, has substantial expertise and familiarity in administering AZT to reduce the risk of transmission of the HIV virus to a fetus and was one of eight clinics nationally to participate in the study upon which the DPH Clinical Advisory was based,

4) Dr. Chie continued to treat Lesley after learning she was HIV-positive and had provided care to other HIV-positive women.

5) Lesley wanted the same doctor to provide both prenatal care and delivery of her baby and, because it was necessary to begin oral AZT during her 14th week of pregnancy (around March 30, 1995, the date Dr. Chie transferred her care) and Leominster Hospital did not have intravenous AZT available on that date, Dr. Chie could not guarantee that he could do both.

Given the undisputed facts, Dr. Chie is entitled to judgment as a matter of law. Even if intravenous AZT were available on March 30, 1995 at Leominster Hospital for Lesley's delivery, and even if a health professional knowledgeable about AZT therapy were available for consultation, a decision by Dr. Chie to transfer Lesley's care to a facility better able to treat her and her unborn child would not constitute discrimination solely on the basis of her HIV-positive status under § 504 of the Rehabilitation Act.

To hold Dr. Chie liable for exercising caution in connection with a high-risk pregnancy would run counter to the principles developed under the Rehabilitation Act which protect a physician's *bona fide* medical treatment decision against "the involvement of federal personnel in medical treatment decisions," (*University Hospital* at 160), and which allow a referral where the disability creates complications which the doctor "lacks the experience or knowledge to address." H.R.Rep. No. 485 at 106.

Aside from the principle that "lengthy litigation primarily involving conflicting expert testimony to determine whether a decision ... was based on a 'bona fide' medical decision" is to be avoided, Lesley does not present evidence that Dr. Chie's decision to transfer was medically inappropriate. Although Lesley's expert, Dr. Minkoff asserts that there is no medical basis for a licensed practitioner of obstetrics to refer an HIV-positive pregnant woman to a high risk clinic for prenatal care and delivery, his opinion anticipates a decision to transfer care based on HIV status alone. He does not address the issue of whether such a transfer is appro-

priate when other complicating factors exist.

Furthermore, Dr. Minkoff's opinion that no specialized knowledge beyond that possessed by a licensed practitioner of obstetrics is necessary to administer AZT conflicts with other evidence presented by Lesley. The DPH Clinical Advisory emphasizes in bold type that "Consultation with an internist, infectious disease specialist, or perinatologist knowledgeable about HIV disease in pregnancy recommended" in connection with the administration of AZT.

In contrast, Dr. Chie presents four affidavits of physicians who state that Dr. Chie's decision to transfer Lesley's care was medically appropriate. One of the affiants asserts that a decision *not* to transfer Lesley's care would be unethical. Lesley's pregnancy involved a number of serious complications which posed a serious threat to the fetus. Moreover, Dr. Chie continued to treat Lesley after learning she was HIV positive and had treated other HIV-positive women in his practice.

Although a physician must make reasonable accommodations for the disabled, § 504 does not "impose an affirmative-action obligation on recipients of federal financial assistance." *Bowen* at 640, 106 S.Ct. 2101. Here, the accommodation of Lesley's disability would come at a high cost, i.e., the risk is severe, if not life-threatening, to a fetus when a doctor is forced to carry out a course of treatment with which he is unfamiliar and has reasonable doubts about his qualifications to perform.

Where treatment by a specialized facility is available as an alternative to treatment by a doctor who has no experience treating a life-threatening illness, the doctor cannot be expected to ignore what he believes to be the best interests of his patient and her fetus and treat the patient himself. In addition, although Dr. Chie might have been able to manage two of Lesley's complications by consultation, the addition of yet another complication which he felt unqualified to treat was reason enough to transfer her care. Lesley was not simply an HIV-positive pregnant woman who presented an otherwise normal pregnancy, the only obstetric complication of which was to manage the prevention of transmittal of the HIV virus to the fetus.

Because Lesley fails to establish a *prima facie* case of discrimination, it is unnecessary to consider Dr. Chie's argument that his reasons for transfer were non-discriminatory and Lesley's argument in reply that the reasons provided by him are pretextual.

### C. Count III: Massachusetts Public Accommodation Statute

The Massachusetts Public Accommodation Statute prohibits:

> any distinction, discrimination or restriction on account of ... any physical or mental disability ... relative to the admission of any person to, or his treatment in any place of public accommodation.

M.G.L. c. 272, § 98.

■ Interpretation of Massachusetts Public Accommodation Statute proceeds "hand in hand" with the interpretation of the Americans with Disabilities Act and the Rehabilitation Act. *See Abbott v. Bragdon*, 107 F.3d 934, 937 n. 1 (1st Cir.1997) *aff'd in part, rev'd in part*, 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (interpretation of the Maine Public Accommodation Statute has "proceeded hand in hand" with the ADA and thus, Courts consider federal and state public accommodation statutes similarly).

Dr. Chie was accepting new patients from the general public and did not restrict who he treated other than on the basis of ability to pay and thus his practice qualifies as a place of public accommodation. The result under the state statute is the same as the result under the Rehabilitation Act based upon the same reasoning expressed above, and thus Dr. Chie did not

violate the Massachusetts Public Accommodation Statute because he did not discriminate against Lesley on the basis of her HIV-positive status.

## V. Conclusion

Dr. Chie is entitled to summary judgment because there is no genuine dispute of material fact regarding his transfer of Lesley's care, and, as a matter of law, he did not discriminate against Lesley "solely" on the basis of her disability as required to establish a claim under § 504 of the Rehabilitation Act and the Massachusetts Public Accommodation Law.

## ORDER

For the foregoing reasons, the Plaintiff's Motion for summary judgment is hereby DENIED and the Defendant's Cross Motion for summary judgment is hereby ALLOWED.

**So ordered.**