# United States Court of Appeals
## For the First Circuit

No. 06-1466

DANIEL BUCHANAN, as Personal Representative of the Estate of
Michael Buchanan; ESTATE OF MICHAEL BUCHANAN,

Plaintiffs, Appellants,

UNITED STATES,

Intervenor,

v.

STATE OF MAINE; LYNN DUBY, individually and in her official
capacity as former Commissioner of the Maine Department of
Behavioral and Developmental Services; JULIANNE EDMONDSON; JOEL
GILBERT; LINCOLN COUNTY; ROBERT EMERSON; KENNETH HATCH; JOHN
NICHOLAS, Commissioner, Maine Department of Health and Human
Services; WILLIAM CARTER; TODD BRACKETT, Sheriff, Lincoln County,

Defendants, Appellees.


APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]


Before

Lynch, Circuit Judge,
Siler,[*] Senior Circuit Judge,
and Lipez, Circuit Judge.


Robert J. Stolt, with whom Lipman, Katz & McKee, P.A. was on
brief, for appellants.

---

[*]     Of the Sixth Circuit, sitting by designation.

Christopher C. Taub, Assistant Attorney General, with whom G. Steven Rowe, Attorney General, and Paul Stern, Deputy Attorney General, Of Counsel, were on brief, for appellees State of Maine, Lynn Duby, Julianne Edmondson, Joel Gilbert, and John Nicholas.

Peter T. Marchesi, with whom Cassandra S. Shaffer and Wheeler & Arey, P.A. were on brief, for appellees Lincoln County, Robert Emerson, Kenneth Hatch, William Carter, and Todd Brackett.

Jessica Dunsay Silver, Attorney, United States Department of Justice, Civil Rights Division, Appellate Section, with whom Wan J. Kim, Assistant Attorney General, and Sarah E. Harrington, Attorney, United States Department of Justice, Civil Rights Division, Appellate Section, were on brief, for the United States as intervenor.

---

November 16, 2006

---

**LYNCH**, <u>Circuit Judge</u>.  The law is no stranger to the tragedies of life.  In February 2002, Michael Buchanan, a mentally ill man, was shot to death inside his isolated Maine home when he repeatedly stabbed one of two deputy sheriffs who had gone to check on Buchanan's safety and welfare.

Believing that Buchanan's death was preventable, Michael's brother Daniel, as administrator, and the estate (together, "plaintiff") filed suit under 42 U.S.C. § 1983 against Lincoln County, two sheriffs, and the two deputy sheriffs, saying that the officers should never have entered the house and that their warrantless entry violated the Fourth Amendment.  Plaintiff does not contend that the officers were unjustified in the shooting -- only that they were unjustified in entering the house, and so setting off the fatal chain of events.

Plaintiff also sued the State of Maine and the County on the theory that they failed to reasonably accommodate Buchanan's need for mental health services as required by Title II of the Americans with Disabilities Act (ADA), <u>see</u> 42 U.S.C. §§ 12131, 12132, thus causing his death.  Plaintiff further made the constitutional claim that Buchanan's case manager, Joel Gilbert, and Gilbert's supervisor, Julianne Edmondson, violated Buchanan's "class of one" equal protection rights.

The State of Maine asserted Eleventh Amendment immunity to the plaintiff's ADA Title II claim.  The district court held

that Title II does not validly abrogate a State's immunity as to claims of access to mental health services and so granted summary judgment to the State.[1]  Buchanan v. Maine, 417 F. Supp. 2d 24, 38-41 (D. Me. 2006); Buchanan v. Maine, 377 F. Supp. 2d 276, 279-83 (D. Me. 2005).

The lengthy and complicated procedural history in this case need not be recited.  Ultimately, the district court entered summary judgment for defendants on all claims.[2]  417 F. Supp. 2d at 44-45 (State defendants); Buchanan v. Maine, 417 F. Supp. 2d 45, 74-75 (D. Me. 2006) (County defendants).  We discuss the court's reasons and the factual record under the pertinent topics.  We affirm the entry of summary judgment in favor of Lincoln County, the two deputy sheriffs, and Buchanan's case manager.  We also hold that judgment for the State of Maine should be entered on the basis that plaintiff failed to establish a claim under Title II.

**I.**

We review a grant of summary judgment de novo; in doing so, we consider the facts in the light most favorable to the

---

[1]  Because this case involves an attack on the constitutionality of a federal statute, this court notified the Attorney General, see Fed. R. App. P. 44(a), who in turn intervened pursuant to 28 U.S.C. § 2403(a) and has provided helpful argument, both by brief and orally.

[2]  Plaintiff does not appeal the district court's entry of summary judgment in favor of the State defendants on plaintiff's claims under the Maine Tort Claims Act, Me. Rev. Stat. Ann. tit. 14, § 8101 et seq.  See Buchanan, 417 F. Supp. 2d at 44.

nonmoving party, drawing all reasonable inferences in his favor. Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000). Issues of law are reviewed de novo. Cotter v. Mass. Ass'n of Minority Law Enforcement Officers, 219 F.3d 31, 34 (1st Cir. 2000).

The following facts are undisputed, except as otherwise noted. Michael Buchanan was born in 1940 and moved to Maine in approximately 1978. Buchanan had shown signs of mental illness since the early 1970s. He was involuntarily committed to the Augusta Mental Health Institute (AMHI) on two separate occasions. The first admission was in 1988, and the second admission lasted from September 11, 1999 to October 19, 1999.

During this time there was litigation in the state courts over whether Maine, "in its . . . provision of treatment and services to present and former patients of AMHI," was violating the state and federal constitutions as well as state and federal laws. Bates v. Dep't of Behavioral & Developmental Servs., 863 A.2d 890, 894 (Me. 2004). In 1990, the parties settled the class action lawsuit by an agreement and consent decree in which Maine did not admit liability, and in which the State was to provide certain health care services.[3] Every class member, generally, upon

---

[3] The consent decree provided that the plaintiff class "would close, retroactive to the State's filing a notice of substantial compliance, upon the date when the court determined that the State was in substantial compliance with the consent decree." Bates, 863 A.2d at 895. As of late 2004, the State had not yet "carr[ied] its burden to establish substantial compliance with the 1990 consent decree." Id. at 913.

discharge from AMHI was entitled to receive an Individualized Support Plan (ISP) assessing the class member's strengths and needs, describing the class member's goals and objectives, and listing the services the class member needed to meet his or her goals and objectives. These individualized plans were to be "coordinated and monitored by a community support worker" who was then responsible for locating and delivering the needed services. Buchanan was a member of this class, as he was discharged from AMHI in October 1999.

In September 1999, while at AMHI, Buchanan was diagnosed with bipolar disorder with psychosis, schizo-affective disorder, and schizophrenia with paranoia. He was discharged on October 19, 1999, having been prescribed three medications: lithium, Haldol, and Cogentin. Buchanan was assigned to Joel Gilbert, an intensive case manager with three years of experience in that position. As an intensive case manager, Gilbert was a community support worker who was responsible for helping mental health clients live independently in the community. Gilbert described his job as helping clients obtain mental health services, as well as any other services they might need, such as housing assistance, welfare benefits, medical care, and fuel assistance. In the community support program, he handled the cases of ten to twelve high-risk patients who were seriously mentally ill.

Over the next month and a half in 1999, Gilbert visited Buchanan's house about once a week to check up on him. The house was located at the end of a one-half- to three-quarter-mile driveway that was frequently impassable by a regular vehicle. On a number of Gilbert's visits, Buchanan told Gilbert that he did not want to participate in the ISP process. The plaintiff maintains that Gilbert did not properly engage Buchanan in developing an ISP. It is uncontested that on December 2, 1999, Gilbert completed an "outreach plan" for Buchanan, under which Gilbert would make weekly visits to Buchanan to check on his living conditions, offer rides to town for errands, take him to doctor's appointments, and encourage him to take his medications.

Gilbert continued to visit Buchanan over the next two years. He took Buchanan grocery shopping at least eleven times. Gilbert took Buchanan to see the doctor at least eight times, picked up and delivered prescription drugs for Buchanan, took Buchanan to get fitted for glasses, and attended a dentist's appointment with Buchanan. Gilbert obtained state funds to purchase a wood stove and a propane heating system for Buchanan's home, as well as a watch so that Buchanan would know when to go out to the main road to be picked up by Gilbert. On two occasions, Gilbert also helped Buchanan fill out food stamp applications.

Plaintiff asserts that, beginning in early 2001, Buchanan, after previously announcing that he would no longer take

his medications, began to demonstrate signs of psychological decompensation.

It is agreed that on December 28, 2001, Gilbert went to Buchanan's home to take him to a fuel assistance appointment. Buchanan accused Gilbert of shutting off his gas and became angry with Gilbert, claiming to have five gun permits and telling Gilbert he did not trust him. Gilbert told Buchanan he could not take him to his fuel assistance appointment in such a condition. According to Gilbert's written report, Buchanan waved his arms, made profane statements, and went back into his house stating, "Don't come back here later, I don't want any[ ]more help, and don't bring those sheriffs here anymore either." As a result of this interaction, Gilbert believed it would be prudent to have a co-worker accompany him on any future visits.

Three days later, on December 31, 2001, Gilbert and a co-worker visited Buchanan's home. Buchanan was polite and did not appear to remember his angry interaction with Gilbert. This was Gilbert's last visit to Buchanan.

Gilbert attempted to visit Buchanan twice in January 2002, but both times was unable to find a co-worker to accompany him. On February 5, 2002, Gilbert called Buchanan's brother Daniel to explain that he had been having difficulty making visits because Buchanan "ha[d] become angry with [his] support." Gilbert did say

that he had been keeping watch over Buchanan through Terry Johnston, Buchanan's neighbor and friend.

On February 25, 2002, Johnston called Gilbert to report that Buchanan had growled and glared at her that morning, and that around 4:30 p.m. the same day, she had learned that someone resembling Buchanan had been spotted lighting a fire in her woodpile. Gilbert told Johnston that the fire was a criminal matter and that she should call the police.

The remaining facts are pertinent particularly for plaintiff's Fourth Amendment claim. Because Buchanan was killed, there is no dispute with respect to most of the facts surrounding the events after the deputies arrived at his house. We have only the account of the deputies. In limited respects, as described later, plaintiff offers a somewhat different version based either on speculation or on inference from physical facts such as the autopsy results.

Johnston took Gilbert's advice and called the Lincoln County Sheriff's Department at approximately 5:11 p.m. on February 25, 2002, asking that officers perform a welfare check on Buchanan. Deputy Kenneth Hatch was assigned to respond to Johnston's call. Johnston told Hatch that she had contacted Buchanan's counselor about her concerns, and that Gilbert had said he would check on Buchanan the following day. She also told Hatch that although she did not wish to pursue any criminal charges, she was afraid

Buchanan might light her barn on fire. After speaking with Johnston, Hatch asked Deputy Robert Emerson to accompany him to Buchanan's home. Another officer informed Hatch that Buchanan had a serious mental illness. The deputies had not had any prior dealings with Buchanan. In response to Johnston's request, the two officers promptly went out to Buchanan's house.

At approximately 5:59 p.m., in the winter dark, the deputies arrived at Buchanan's unplowed, snow-covered access road and set off on foot to reach the house. The house was approximately thirty-six feet long and twenty-four feet wide, and had a "daylight basement" with a single story over the basement. The deputies walked outside the house to the area where lights were on in the upstairs of the house. Hatch knocked on the door leading into the basement several times, but there was no response. Emerson saw Buchanan walk to the window on the long side of the house. Buchanan appeared to be screaming something, but Emerson could not hear what he was saying.

Buchanan then walked to a window on the short side of the house, and pushed it open. Buchanan screamed out the window that he worked for the Massachusetts Sheriff's Department; he also said, "You are not throwing me in a Nazi Jewish oven." Emerson yelled, "Michael, are you okay? We are here to check on you." Buchanan answered that the deputies were not there to check on him, and then he started screaming about being with the New York State Police,

that he was with the federal government, and that he had the right to sell guns. Buchanan also said something about "not having any fires." Emerson yelled to Hatch and asked if he saw any fires. Hatch walked around the house, looking for open fires in or around the building. He found none.

Emerson explained to Buchanan that they only wanted to talk to him, but Buchanan said "No" and that they were trying to get "Evelyn" after him. Buchanan told the deputies to get off his property, to go back to the main road, and that he was going to kill them.

Buchanan walked away from the window, then reappeared and threw some liquid at Emerson. Emerson managed to avoid being hit by most of the liquid, which smelled of liquor. Emerson thought that Buchanan was "beyond agitated" and seemed upset with the officers for reasons wholly unrelated to the stated purpose of their visit. Buchanan then shut the window, turned off the light in the room, went to the other side of the house, and turned lights on there.

Around 6:20 p.m., while Emerson was still trying to talk with Buchanan, Hatch radioed dispatch to advise the officer of the situation and asked him to get in touch with Buchanan's mental health counselor to see what he advised. About one minute later, Hatch was told that Gilbert's line was busy; he instructed the officer to break through the line.

-11-

There was a loud smashing sound, which Emerson thought might be a gunshot; Hatch told Emerson that he was unsure but believed the noise was that of a window breaking. At approximately 6:24 p.m., after hearing the noise of shattering glass, Hatch spoke to dispatch and requested that the on-call supervisor be contacted and advised.[4] Hatch did not tell Emerson that he had called the supervisor for advice.

Buchanan walked down the stairs of his home and appeared at the basement door. Emerson could see that the knuckles on at least one of Buchanan's hands were bloody. Emerson thought that Buchanan had put his fist through glass, and that this explained the earlier smashing sound. Buchanan opened the door and began screaming at Emerson and swearing about the "warrants." Emerson explained in a soft voice that the deputies were only at Buchanan's house to talk to him. Buchanan spit on Emerson, hitting the deputy on his chest. Emerson continued to speak to Buchanan in a quiet, calm voice. Buchanan then turned and walked back into the house. We take these facts as the deputies recount them because plaintiff has offered no contrary facts.

Emerson followed Buchanan into the house. Buchanan, who was on the second or third step of the staircase, spit at Emerson again. In his incident report, Emerson explained that by this time

---

[4] Although dispatch later radioed Hatch that the supervisor was on the way, Hatch did not receive the message because, by then, there had been the struggle in Buchanan's home.

-12-

he had decided that even though Buchanan had committed several criminal acts, Emerson's thoughts were not to arrest Buchanan, but that it would be best to put Buchanan in protective custody and have him evaluated, because Emerson believed Buchanan was in an unstable mental state. Emerson listed Buchanan's agitated condition, his nonsensical screaming, and his apparently self-inflicted injuries as reasons why he believed putting Buchanan into protective custody was appropriate.

Hatch came to the door and saw a "spot of blood" on one of Buchanan's hands. Buchanan was again yelling and screaming, with his hands on the railing of the staircase. Emerson observed that there was fresh blood on Buchanan's hands, and although there wasn't "a lot" of blood, there was a "substantial" amount of blood. Emerson attempted to grab both of Buchanan's hands to subdue him, but Buchanan pulled his hands back, spit at Emerson a third time, and started up the basement stairs. Emerson followed.[5]

Buchanan went into a room and then returned to the top of the basement stairs, now carrying a knife. By this time, Deputy Emerson was almost at the top of the staircase, and Deputy Hatch was on the third or fourth step. Buchanan grabbed Emerson, and Emerson in turn attempted to reach for the knife. Buchanan grabbed

---

[5] There is no support in the record for plaintiff's argument that Emerson broke into Buchanan's house (by pushing a plywood panel out of the door and removing a two-by-four that had been wedged against the door as a lock) and that Emerson and Hatch crept up the stairs only to be startled by Buchanan at the landing.

Emerson's back and pushed him down against the stairs.  Emerson screamed "knife" as Buchanan stabbed Emerson in the back of the shoulder.  Emerson screamed for Hatch's help.  Hatch drew his gun; Buchanan looked at Hatch as he continued to stab Emerson and did not stop.  Hatch fired, but Buchanan stabbed Emerson at least two more times in the back and more times in the back of the head.[6] Hatch then repeatedly shot Buchanan until Buchanan fell over the railing on the stairs to the floor below.  Hatch had hit Buchanan a total of four times.  The first shot had hit Buchanan on the left side of his skull; the second, third, and fourth shots had all entered the left side of Buchanan's neck.  The wounds were fatal.

## II.

A.        Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  For summary judgment purposes, "'genuine' means that 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' and a 'material fact' is one which 'might affect the outcome of the suit under the governing law.'"  Seaboard Sur.

---

[6]     Emerson was taken by ambulance to the hospital and was treated for his wounds.  He was discharged later on the evening of February 25, 2002.

-14-

Co. v. Town of Greenfield, 370 F.3d 215, 218-19 (1st Cir. 2004) (quoting Hayes v. Douglas Dynamics, Inc., 8 F.3d 88, 90 (1st Cir. 1993) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, (1986))) (internal quotation marks omitted).

We review the district court's entry of summary judgment de novo, "construing the record in the light most favorable to the nonmovant and resolving all reasonable inferences in that party's favor." Carroll v. Xerox Corp., 294 F.3d 231, 237 (1st Cir. 2002). However, we may ignore "conclusory allegations, improbable inferences, and unsupported speculation" put forward by the nonmoving party. See Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

B.        Section 1983 Claim Against Deputies Emerson and Hatch

The parties agree on the applicable constitutional theory under the Fourth Amendment. "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." United States v. Adams, 621 F.2d 41, 43 (1st Cir. 1980) (quoting Payton v. New York, 445 U.S. 573, 590 (1980)) (internal quotation marks omitted). Law enforcement officers may make warrantless entries "when they reasonably believe that a person within is in need of immediate aid." Mincey v. Arizona, 437 U.S. 385, 392 (1978).

-15-

Following the dictates of Saucier v. Katz, 533 U.S. 194 (2001), this circuit uses a three-part test when evaluating a question of qualified immunity. "In a suit against an officer for an alleged violation of a constitutional right, the requisites of a qualified immunity defense must be considered in proper sequence." Id. at 200. The court "generally [should] address first the question whether at some abstract level the plaintiffs have asserted a violation of constitutional rights, second whether those rights are clearly established, and third whether a reasonable officer could have concluded that his actions did not violate plaintiffs' constitutional rights." Tremblay v. McClellan, 350 F.3d 195, 199 (1st Cir. 2003).

Plaintiff argues that there were no extenuating circumstances to justify the officers' decision to enter Buchanan's house without a warrant when they did, that no reasonable officer would have thought there were such circumstances, and that the entry inevitably led to Buchanan's death. According to plaintiff, Buchanan's odd behavior and ranting did not justify entry into the house. In fact, plaintiff argues, Buchanan made it clear that he wanted the deputies to leave, and had the officers done so, Buchanan would be alive today.

Plaintiff also argues that Buchanan posed no threat to himself. The cut on his hand, as the autopsy photos showed, was not serious. Nor did Buchanan pose any threat to anyone else.

Furthermore, Buchanan did not provoke anyone: it was the officers who came to Buchanan and made him feel threatened, particularly when they entered Buchanan's house after he made it plain they should leave. Plaintiff argues that a reasonable officer would have waited outside Buchanan's house before making such a precipitous entry. After all, plaintiff argues, Hatch had asked the dispatch officer to contact Gilbert for advice on how to proceed. Hatch should have waited to get that advice.

There are no material disputes of fact, only disagreement about the conclusions to be drawn. The district court held that defendants were entitled to summary judgment on the merits, and that whether or not Hatch and Emerson had violated Buchanan's Fourth Amendment rights, the deputies would nonetheless be entitled to qualified immunity. Buchanan, 417 F. Supp. 2d at 57-60.

Turning to the first step of the immunity analysis, if we were to look only at the allegations in plaintiff's complaint, then we would conclude that the plaintiff has asserted a constitutional right to be free from warrantless entry in the absence of extenuating circumstances. The question becomes more complicated when there has been development of facts and a summary judgment record is before the court. We addressed that situation in Riverdale Mills Corp. v. Pimpare, 392 F.3d 55 (1st Cir. 2004):

> Where, as here, qualified immunity is brought
> at the summary judgment stage, the inquiry on
> the first prong is somewhat different. The
> language in Saucier is ambiguous on this

-17-

> point; the case refers both to "the facts alleged" and to the "parties' submissions." But subsequent Supreme Court cases have clarified, implicitly if not explicitly, that courts assessing the first prong at summary judgment should look beyond the complaint to the broader summary judgment record.

Id. at 61-62 (citation omitted) (quoting Saucier, 533 U.S. at 201).

We noted that there was some flexibility in the application of the first prong, and that Saucier itself suggested that the law elaboration function of the first prong would be well served only in "appropriate cases." Id. at 62 (quoting Saucier, 533 U.S. at 207) (internal quotation marks omitted). We also observed:

> [I]n some cases, such as where the claim depends on a "kaleidoscope of facts not yet fully developed," the law elaboration function is not well served and thus the Saucier rule may not strictly apply. Moreover, the level of specificity at which the first prong is analyzed may change depending on a given inquiry's utility in further elaborating the law.

Id. (citation omitted) (quoting Dirrane v. Brookline Police Dep't, 315 F.3d 65, 69-70 (1st Cir. 2002)). In Riverdale, we did not address, on the first prong, the question of Fourth Amendment reasonableness, but rather the antecedent question of law as to whether there had been a "search." Id. at 62-64.

We do not think the law elaboration purpose will be well served here, where the Fourth Amendment question is a reasonableness question which is highly idiosyncratic and heavily

-18-

dependent on the facts. The question is close whether under normal summary judgment rules, drawing all inferences in plaintiff's favor, this record would preclude submission to the jury of the question whether, given the circumstances, the officers reasonably entered Buchanan's house when they did rather than wait to see if they could break through a busy phone line to ask Buchanan's social worker for advice. On summary judgment on qualified immunity, the threshold question is whether all the uncontested facts and any contested facts looked at in plaintiff's favor show a constitutional violation. Burke v. Town of Walpole, 405 F.3d 66, 77 (1st Cir. 2005); see also Perez v. Oakland County, --- F.3d ---, No. 05-1583, 2006 WL 2956513, at *8-9 (6th Cir. Oct. 18, 2006). Given the complexity of the matter, and since it is perfectly clear that the officers are entitled to immunity, we turn to the second and third prongs. Cf. Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (expressing no view on correctness of the Court of Appeals' decision on constitutional question, but reaching remaining prongs of immunity analysis).

At the time of the deputies' visit to Buchanan's home, it had been clearly established that "a warrantless entry . . . of a residence may be 'reasonable,' in Fourth Amendment terms," but was not reasonable unless "the government [could] demonstrate . . . 'exigent circumstances,'" such as "an imminent threat to the life or safety of members of the public, the police officers, or a

-19-

person located within the residence." McCabe v. Life-Line Ambulance Serv., Inc., 77 F.3d 540, 545 (1st Cir. 1996) (citing United States v. Tibolt, 72 F.3d 965, 969 (1st Cir. 1995); Hegarty v. Somerset County, 53 F.3d 1367, 1374 (1st Cir. 1995)); see also Brigham City v. Stuart, 126 S. Ct. 1943, 1947 (2006) ("[L]aw enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." (citing Mincey, 437 U.S. at 392)); Welsh v. Wisconsin, 466 U.S. 740, 748-49 (1984); United States v. Curzi, 867 F.2d 36, 41 (1st Cir. 1989).

But, under Saucier, that level of analysis is insufficient. The relevant inquiry is whether it would be clear to a reasonable officer that his conduct would be unlawful in the situation he confronted, and this inquiry must be taken in light of the case's specific context, not as a broad general proposition. Saucier, 533 U.S. at 201-02. We cannot say the officers had fair warning under the law that if they entered the house when they did, they would violate Buchanan's Fourth Amendment rights. While there is no case directly on point, case law tended to support the officers' actions, not put them on notice of illegality. Cf. Anthony v. City of New York, 339 F.3d 129, 136 (2d Cir. 2003) (qualified immunity affirmed for officers who made warrantless entry to apartment of mentally ill woman who claimed to be under attack).

-20-

The third prong of the qualified immunity analysis recognizes that "law enforcement officials will in some cases reasonably but mistakenly conclude that [their conduct] is . . . lawful"; "in such cases those officials -- like other officials who act in ways they reasonably believe to be lawful -- should not be held personally liable." Anderson v. Creighton, 483 U.S. 635, 641 (1987). Even if we were wrong in our analysis thus far, the deputies would be entitled to immunity on the third prong. Our inquiry at this stage is limited to those objective facts known to (or discernible by) the officers at the time of the event. Tibolt, 72 F.3d at 969.

Emerson and Hatch argue that they reasonably believed their actions were lawful and were authorized by Maine's protective custody statute, which provides:

> If a law enforcement officer has reasonable grounds to believe, based upon probable cause, that a person may be mentally ill and that due to that condition the person presents a threat of imminent and substantial physical harm to that person or to other persons, . . . the law enforcement officer . . . [m]ay take the person into protective custody . . . .

Me. Rev. Stat. Ann. tit. 34-B, § 3862(1), (1)(A). Plaintiff agrees that the statute meets constitutional standards. And we agree with plaintiff that the Maine statute does not permit warrantless entry into a home simply because officers think the occupant is mentally ill.

-21-

The police had grounds to go to the house because someone matching Buchanan's description had been spotted attempting to light a fire on Terry Johnston's woodpile, Johnston had requested that they go and check on Buchanan's welfare, and she also said she was afraid her barn would be set afire. The deputies certainly had reasonable grounds to believe that Buchanan was mentally ill. Hatch had been informed of this fact by another officer, and the call from Johnston gave rise to suspicion. The phone call was not from an anonymous caller, and Johnston directly asked that the deputies check on Buchanan; Deputy Hatch also knew that Johnston had just spoken with Buchanan's mental health counselor, who was planning on visiting Buchanan the next day. Moreover, Buchanan's own behavior, discussed earlier, clearly confirmed his mental illness.

The deputies also had reasonable grounds to believe that Buchanan presented a threat of imminent and substantial physical harm to himself or others, including the deputies themselves. The cut on Buchanan's hand, caused by his punching out a window, need not have been life threatening for the officers to have been justified in entering the house. See Brigham City, 126 S. Ct. at 1947 (citing Mincey, 437 U.S. at 392).

As to risk to others: Buchanan had threatened to kill Emerson and Hatch; he had thrown liquid at Emerson; he had spit at Emerson three times; someone matching his description had been

-22-

spotted attempting to light a fire in his neighbor's woodpile; and the neighbor was afraid Buchanan would burn down her barn.

A reasonable officer could have believed that waiting was not a good idea. There was no assurance the deputies could reach the social worker or that he would have been able to calm Buchanan or provide meaningful help to the officers from his remote location. Plaintiff put on no evidence that a reasonable officer would have waited. Further, the situation was escalating, with Buchanan punching out a window on a cold night, and the deputies did not know that the social worker would be available once the phone line was cleared. Even if the officers were mistaken, this was a reasonable judgment call, and they are entitled to immunity.[7] See Tremblay, 350 F.3d at 200-01 (finding qualified immunity on third prong for officer who took into protective custody a teenager when it was reasonable to suspect youth's person or welfare was endangered).

---

[7]    In his initial brief, plaintiff failed to challenge the dismissal of the § 1983 Fourth Amendment claims against the County and Sheriffs William Carter and Todd Brackett. To the extent plaintiff makes this argument in his reply brief (and it is not clear that he has) he has waived the argument. See Hoult v. Hoult, 373 F.3d 47, 54 (1st Cir. 2004) (arguments made for the first time in an appellant's reply brief are waived); Ryan v. Royal Ins. Co., 916 F.2d 731, 734 (1st Cir. 1990) ("[I]ssues adverted to on appeal in a perfunctory manner, unaccompanied by some developed argumentation, are deemed to have been abandoned.").

C.      ADA Title II Claims Against Maine and Lincoln County

1.      Elements of an ADA Title II Claim

Before reaching the merits of plaintiff's ADA Title II claims or Maine's Eleventh Amendment immunity defense, we describe Title II. The ADA itself has five titles, three of which are meant to eliminate in a distinct area discrimination against persons with disabilities. Title I of the ADA, 42 U.S.C. §§ 12111-12117, addresses discrimination by employers affecting interstate commerce; Title II, id. §§ 12131-12165, addresses discrimination by governmental entities in the operation of public services, programs, and activities, including transportation; and Title III, id. §§ 12181-12189, addresses discrimination in public accommodations and services operated by private entities.

Title II of the ADA provides, inter alia, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." Id. § 12132. The statute defines "qualified individual with a disability" as

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the

-24-

> receipt of services or the participation in programs or activities provided by a public entity.

Id. § 12131(2).

To prevail on a Title II claim, a plaintiff must demonstrate:

> (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.

Parker v. Universidad de Puerto Rico, 225 F.3d 1, 5 (1st Cir. 2000).

It is not disputed that Buchanan was a person with a disability. The Title II dispute is over whether plaintiff has shown all three prongs, including that Buchanan was a qualified individual. We return to this topic after addressing the State's Eleventh Amendment argument in response to the Title II claim.

2.      Title II Claims Against Maine

The district court held that "Title II of the ADA, as applied to access to public mental health services, does not validly abrogate the State's sovereign immunity and cannot be enforced against the State of Maine in a lawsuit for monetary damages." Buchanan, 377 F. Supp. 2d at 283. Later, the court reaffirmed its previous ruling that Title II did not abrogate Maine's sovereign immunity; it also concluded that neither the AMHI

-25-

consent decree nor the settlement agreement waived the State's immunity against suit. Buchanan, 417 F. Supp. 2d at 40-41. On these grounds, the district court granted summary judgment in favor of Maine with respect to plaintiff's Title II claim. Id. at 41.

a. Maine's Eleventh Amendment Defense

We set the Eleventh Amendment issue in context. The Eleventh Amendment ordinarily renders States immune from suits for monetary relief in federal court by private citizens. See Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 54 (1996). Nonetheless, Congress may abrogate States' immunity if it "unequivocally expressed its intent to abrogate that immunity" and "acted pursuant to a valid grant of constitutional authority." Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 73 (2000). Congress unequivocally expressed its intent in the ADA to abrogate the States' sovereign immunity. See 42 U.S.C. § 12202; Tennessee v. Lane, 541 U.S. 509, 518 (2004). Congress's constitutional authority to do so rests on Section 5 of the Fourteenth Amendment. "Congress can abrogate a State's sovereign immunity when it does so pursuant to a valid exercise of its power under [Section] 5 of the Fourteenth Amendment to enforce the substantive guarantees of that Amendment." Lane, 541 U.S. at 518.

Section 5 of the Fourteenth Amendment is an affirmative grant of legislative power to Congress, see Kimel, 528 U.S. at 80, providing Congress the "authority both to remedy and to deter

-26-

violation of [Fourteenth Amendment] rights . . . by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text."  Id.; see also Nev. Dep't of Human Res. v. Hibbs, 538 U.S. 721, 727 (2003).  Under Section 5, Congress may not only remedy past violations of constitutional rights, but also enact "prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct."  Hibbs, 538 U.S. at 727-28.  Further, Congress may prohibit "practices that are discriminatory in effect, if not in intent, to carry out the basic objectives of the Equal Protection Clause."  Lane, 541 U.S. at 520.

The mere invocation of Section 5 by Congress does not establish that the legislation is constitutional.  Legislation must demonstrate "a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end."  City of Boerne v. Flores, 521 U.S. 507, 520 (1997).  In evaluating whether Title II is an appropriate response to past unconstitutional treatment of individuals with disabilities, the Supreme Court in Lane declined to address Title II as a whole, upholding it instead as "valid [Section] 5 legislation as it applies to the class of cases implicating the accessibility of judicial services."  541 U.S. at 531.

Applying these principles, the district court held that application of Title II to plaintiff's claims would be

-27-

unconstitutional under the Eleventh Amendment. We do not resolve the merits of the Eleventh Amendment defense. There is a protocol by which such Eleventh Amendment claims should be decided. Applying that protocol, we do not reach the merits of the Eleventh Amendment issue, nor should the district court have done so. Both Maine and the United States agree that before the immunity issue is reached, the court must first address whether plaintiff's Title II claim fails on the merits.

b.      Protocol For Deciding Eleventh Amendment Issues

Two related doctrines dictate the protocol to be used in analyzing claims that, under the Eleventh Amendment, Title II may not be constitutionally applied to permit suits against unconsenting States even when Congress has clearly expressed its intention that States be subject to such suits.

The first is well known: the doctrine of constitutional avoidance. It is a "fundamental and longstanding principle of judicial restraint that courts [should] avoid reaching constitutional questions in advance of the necessity of deciding them." Lyng v. Nw. Indian Cemetery Protective Ass'n, 485 U.S. 439, 445 (1988). Thus, "prior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision." Gulf Oil Co. v. Bernard, 452 U.S. 89, 99 (1981) (citing Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 347 (1936) (Brandeis, J., concurring)).

The second doctrine stems from the recent Supreme Court decision in United States v. Georgia, 126 S. Ct. 877 (2006), in which the Court set forth a step-by-step analysis for Title II claims and explained that lower courts should

> determine . . . on a claim-by-claim basis, (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.

Id. at 882.

Under Georgia, the court must determine in the first instance, on a claim-by-claim basis, which aspects of the State's alleged conduct violated Title II.[8] Id. If the State's conduct

---

[8] Eleventh Amendment immunity is meant to protect the State from being subject to suit at all. See Seminole Tribe, 517 U.S. at 54. Yet the Georgia protocol may require the State to defend litigation before obtaining a ruling on immunity. It may be difficult in some instances to determine on motions under Rule 12(b)(6) whether plaintiff's complaint stated a viable Title II claim. That is so because of both the generous notice pleading rules in federal practice and the rule that no greater pleading requirements are imposed on civil rights plaintiffs. See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168 (1993); Pagán v. Calderón, 448 F.3d 16, 31 (1st Cir. 2006). As a result, there may need to be further specificity about the precise nature of the plaintiff's claims and some discovery after the suit begins. Title II may be constitutional at least for claims "against the States for conduct that actually violates the Fourteenth Amendment." Georgia, 126 S. Ct. at 882. This again demands some greater specificity as to the alleged Title II claims.

In Georgia, the plaintiff's pro se complaint had been supplemented by numerous filings specifying more precisely the nature of his claims, some of which asserted Eighth Amendment violations. Id. at 879-80. The Supreme Court ordered that the

-29-

does not violate Title II, the court does not proceed to the next step in the analysis. The claim ends. Cf. Toledo v. Sánchez, 454 F.3d 24, 31-40 (1st Cir. 2006) (finding a sufficient allegation that the defendant had violated Title II, and thus proceeding with the analysis).

In this case, the summary judgment record establishes that there is no Title II claim against the State and, as a result, it was error for the district court to reach the Eleventh Amendment issue. Judgment for the State of Maine, then, is affirmed on the grounds that plaintiff failed to establish a violation of Title II, but not on the grounds of Eleventh Amendment immunity.

c.      There Was No Violation of Title II

For the reasons that follow, we hold that plaintiff has not established a claim under Title II: (1) he has not shown that Buchanan was a qualified individual; (2) he has not shown that Buchanan was excluded from participation in or denied the benefits provided by Maine, or that he was otherwise discriminated against; and (3) there is no evidence that the reason Maine did not provide such services as plaintiff says were due was "by reason of [his] disability." See 42 U.S.C. § 12132.

---

case be remanded so that its three-part test could be applied to an amended complaint. Id. at 882. Justice Stevens, in a concurrence, noted that the Court's opinion "wisely permits the parties . . . to create a factual record that will inform [the Eleventh Amendment question]." Id. (Stevens, J., concurring).

It is significant that this case does not raise the special category of claims about deinstitutionalization of institutionalized mentally ill patients. See Olmstead v. Zimring, 527 U.S. 581, 599-601 (1999); 28 C.F.R. § 35.130(d). Buchanan was placed in a community setting, which is one of the objectives of the ADA. See 42 U.S.C. §§ 12101(a)(2), (5) (describing the isolation and segregation of disabled individuals as a "form[] of discrimination" and "a serious and pervasive social problem").

While it is clear Buchanan was disabled, we initially defer the question of whether he was a "qualified individual." Id. § 12131(2).[9] The law has recognized certain guiding principles for ADA claims asserting that the disabled are being denied medical or mental health treatment benefits. One is that, generally, the State is not obligated to provide new programs or services to the disabled which it has not previously provided to any group. For example, where New York did not provide safety-monitoring services to the physically disabled, the ADA did not compel the State to provide such services to the mentally disabled. Rodriguez v. City of New York, 197 F.3d 611, 618-19 (2d Cir. 1999). Also, where a State did not already provide the vocational services sought by the

---

[9] As several courts have pointed out, the very concept of a "qualified individual" poses analytical difficulties on facts like these, where a state provides services precisely because an individual is disabled. Fitzgerald v. Corrs. Corp. of Am., 403 F.3d 1134, 1144 (10th Cir. 2005); Doe v. Pfrommer, 148 F.3d 73, 82-83 (2d Cir. 1998).

-31-

plaintiff, a claim of illegal discrimination under Title II was not cognizable.  See Doe v. Pfrommer, 148 F.3d 73, 83-84 (2d Cir. 1998).

Although the ADA does not itself mandate the provision of services, it does prohibit discrimination against the disabled within the services that are provided.  For example, in Olmstead, the Supreme Court found there was a discrimination claim under the ADA where Georgia had denied mentally disabled patients entry into existing community-based treatment programs that were available to the non-institutionalized mentally disabled.  527 U.S. at 607.

The Supreme Court has been clear about what the ADA does not require.  The Olmstead Court said in response to the dissent's concerns:

> We do not in this opinion hold that the ADA imposes on the States a "standard of care" for whatever medical services they render, or that the ADA requires States to "provide a certain level of benefits to individuals with disabilities."

527 U.S. at 603 n.14 (citation omitted) (quoting id. at 623, 624 (Thomas, J., dissenting) (charging that "the type of claim approved of by the majority does not concern a prohibition against certain conduct (the traditional understanding of discrimination), but rather concerns imposition of a standard of care")).

Olmstead also held that a State may rely on the reasonable assessment of its own professionals in determining whether a patient meets the requirements for a particular treatment

-32-

program.  Id. at 602.  That is because, in part, "courts normally should defer to the reasonable medical judgments of public health officials." Sch. Bd. of Nassau County v. Arline, 480 U.S. 273, 288 (1987).  We understand this to relate at least to the question of whether a plaintiff is a "qualified" individual.

Further, the Olmstead Court held that the ADA does not require that a particular treatment be foisted on an unwilling participant.  Olmstead, 527 U.S. at 602 (citing 28 C.F.R. § 35.130(e)(1); id. pt. 35, App. A).  This is another aspect of whether the plaintiff is a "qualified" individual.

The theme that the ADA does not set a standard of care for services or require the States to provide a certain level of benefits was sounded earlier in Alexander v. Choate, 469 U.S. 287 (1985), a case about the non-discrimination aspects of the Rehabilitation Act of 1973:

> Medicaid programs do not guarantee that each recipient will receive that level of health care precisely tailored to his or her particular needs. . . . [T]he benefit provided remains the individual services offered -- not "adequate health care."

Id. at 303.  These tests have been routinely applied by the courts of appeals.  See Schiavo v. Schiavo, 403 F.3d 1289, 1300 (11th Cir. 2005); Radaszewski v. Maram, 383 F.3d 599, 608 (7th Cir. 2004); Townsend v. Quasim, 328 F.3d 511, 518 (9th Cir. 2003); Cercpac v. Health & Hosps. Corp., 147 F.3d 165, 168 (2d Cir. 1998) ("[T]he

-33-

[Rehabilitation Act and ADA] do not guarantee any particular level of medical care for disabled persons . . . .").

This circuit, in <u>Kiman</u> v. <u>New Hampshire Department of Corrections</u>, 451 F.3d 274 (1st Cir. 2006), has recognized the distinction between ADA claims based on negligent medical care and those based on discriminatory medical care. <u>Id.</u> at 284; <u>see</u> <u>also</u> <u>Fitzgerald</u> v. <u>Corrs. Corp. of Am.</u>, 403 F.3d 1134, 1144 (10th Cir. 2005) ("[P]urely medical decisions . . . do not ordinarily fall within the scope of the ADA or the Rehabilitation Act."); <u>Bryant</u> v. <u>Madigan</u>, 84 F.3d 246, 249 (7th Cir. 1996) ("The ADA does not create a remedy for medical malpractice."). The State argues that plaintiff's claim must fail because it merely alleges inadequate health care, which does not constitute a Title II violation.[10]

_____

[10]   Maine also makes the argument that Title II "mandate[s] only that the services provided by [the defendant] to non-handicapped individuals not be denied to a disabled person because he is handicapped." Brief of Defendants/Appellees State of Maine et al. at 40 (alterations in original) (quoting <u>Pfrommer</u>, 148 F.3d at 83) (internal quotation marks omitted). On this point, there is tension between <u>Pfrommer</u> and the Supreme Court's decision in <u>Olmstead</u>, 527 U.S. at 598 & n.10 (1999) (rejecting the argument that "discrimination" does not encompass "disparate treatment among members of the <u>same</u> protected class" (quoting <u>id.</u> at 616 (Thomas, J., dissenting))).
    At oral argument, the United States disagreed with Maine's argument and argued that a Title II violation would indeed occur if a public entity decided to make benefits available only to disabled individuals but then proceeded to distribute those benefits only to those disabled people who could access an administrative office on the second floor of a building lacking wheelchair ramps or elevators. We do not address the abstract question.

-34-

By the time of the summary judgment motions, plaintiff's claim came down to specifics that demonstrated that the claim was not about discriminatory denial of services, but rather about the adequacy of treatment. When asked to identify the particular services that Buchanan was denied and how that denial constituted discrimination under the ADA, plaintiff asserted that Joel Gilbert "did nothing to enable [Buchanan] to understand his mental health problems or assist him to understand and to obtain the help he needed to continue to live with some independence and dignity in the community." When asked to list the reasonable accommodations that should have been provided to Buchanan, plaintiff stated that Gilbert should have (1) made weekly check-ups, (2) performed additional medical check-ups, (3) amended Buchanan's service plan to reflect his increasing needs, and (4) provided assistance and crisis intervention when he received Johnston's phone call on February 25, 2002. Plaintiff asserts Buchanan was denied an ISP.

The record is uncontested that Maine, through Gilbert, did make regular check-ups, did attempt to meet Buchanan's increasing needs, and did provide assistance and crisis intervention. There is no viable claim that Maine did not provide mental health services to the disabled, and there is no viable claim that Maine did provide services to the disabled but discriminated among categories of the disabled in doing so. Further, under Olmstead, plaintiff has not shown the State's

-35-

treatment professionals determined these additional services were required, see 527 U.S. at 603, nor does plaintiff offer any expert testimony that they were necessary.

As to the argument that the State failed to provide Buchanan an ISP, Buchanan repeatedly declined to participate in the ISP process as envisioned by the AMHI settlement agreement.[11] On October 7, 1999, in his first meeting with Gilbert, Buchanan was "not interested in receiving services." On March 1, June 8, and September 13 of 2000, state employee Donald Beckwith spoke with Buchanan about creating an ISP. On each occasion, Buchanan refused. On four more occasions between December 12, 2000 and December 12, 2001, Buchanan declined offers from Gilbert to set up a treatment plan. Here, the ISP was "opposed by the affected individual." Id. at 587.

There is also no evidence that Buchanan was either discriminated against or not provided the additional services the plaintiff seeks "by reason of" his disability. See Forestier Fradera v. Municipality of Mayagüez, 440 F.3d 17, 22 (1st Cir. 2006); Parker, 225 F.3d at 5.

Finally, we address the question raised by this court's case law, both under § 504 of the Rehabilitation Act and under the

---

[11] Under the settlement agreement, "[c]lass members have the right to refuse all or some of the services offered," subject to certain exceptions involving issues like involuntary hospitalizations and incapacity to consent.

ADA, that there is a limited basis for a challenge to medical treatment decisions if and only if the challenge is framed within a larger theory of disability discrimination. See Kiman, 451 F.3d at 284-85; Lesley v. Chie, 250 F.3d 47, 55 (1st Cir. 2001). We have described two situations in which a challenge based on a treatment decision might be made: (1) the treatment decision was so unreasonable as to be arbitrary and capricious, raising an implication of pretext for some discriminatory motive, and (2) if not pretextual, the treatment decision was based on stereotypes of the disabled rather than an individualized inquiry as to the plaintiff's conditions. Kiman, 451 F.3d at 284-85. There was nothing unreasonable about the treatment decisions in this case and certainly no stereotyping, so neither of these arguments is available.[12]

On these facts, judgment for Maine should be entered on the grounds that no Title II claim has been established.

---

[12] While we need not reach the reasonable accommodation arguments, the plaintiff has made no showing that the State, taking into account the needs of others with mental disabilities, had the available resources to do what plaintiff suggests was required. In fact, as to the weekly visit claim, Gilbert had planned on regular meetings with Buchanan but sensibly, in light of Buchanan's behavior on December 28, 2001, wanted to have a co-worker with him. Although Gilbert tried to visit Buchanan twice in January 2002, he could not find a co-worker to go with him. So Gilbert tried to keep tabs on Buchanan with the help of a private citizen.

3.      Title II Claims Against Lincoln County

Plaintiff argues the district court erred in granting summary judgment to Lincoln County on his Title II claim.  He argues that the County failed to reasonably accommodate Buchanan's disability by (1) failing to draft law enforcement policies accommodating the needs of mentally ill members of the public, and (2) failing to adequately train its officers on the needs of the mentally ill public.

On appeal, plaintiff argues that the district court misunderstood his Title II claim as asserting that Title II of the ADA governs how persons are taken into custody and prohibits arrests based on misperceptions caused by disability.  He disavows those theories as factually inappropriate, and he says the court's analysis "is misplaced."[13]  His point, he argues, is that the law requires sufficient training of officers to prevent miscommunication.

We bypass the question of whether Title II of the ADA imposes duties on a county sheriff's department to draft policies and train officers on the needs of the mentally ill public.

---

[13]  Accordingly, we do not address the district court's analysis, see Buchanan, 417 F. Supp. 2d at 72-73, relying on Hainze v. Richards, 207 F.3d 795, 802 (5th Cir. 2000); Gohier v. Enright, 186 F.3d 1216, 1220-21 (10th Cir. 1999); and Lewis v. Truitt, 960 F. Supp. 175, 178-79 (S.D. Ind. 1997).  It is questionable whether the ADA was intended to impose any requirements on police entering a residence to take someone into protective or other custody beyond the reasonableness requirement of the Fourth Amendment, described earlier.

Whether obliged to do so by Title II or not, the County did in fact have such policies and such training.

The Lincoln County Sheriff's Department drafted a policy titled "Response to Deviant Behavior" on November 20, 1995. That policy went into effect on December 15, 1995 and specifically addresses issues concerning mentally ill persons. The document states that "[i]t shall be the policy of this agency to assist persons who are exhibiting symptoms of deviant behavior and appear to represent an imminent danger to themselves or to someone else." The stated purpose of the policy is "[t]o describe deviant behavior and circumstances under which police personnel will make an arrest or protective detention in order to assist said person or protect the general public." Furthermore, Deputies Emerson and Hatch were trained on the Lincoln County Sheriff's Department Policies on both "Response to Deviant Behavior" and "Use of Force." Emerson and Hatch also received additional training with respect to the identification of mentally ill persons and methods to employ when dealing with such persons.

Plaintiff contends that the policies put in place by the County and the training received by Emerson and Hatch were deficient. In particular, plaintiff takes issue with the lack of procedures and training to assist officers in <u>successfully communicating</u> with mentally ill individuals. An argument that police training, which was provided, was insufficient does not

present a viable claim that Buchanan was "denied the benefits of the services . . . of a public entity" by reason of his mental illness, as required under 42 U.S.C. § 12132.[14]

D.      Section 1983 Claim Against Case Manager Gilbert

On the equal protection "class of one" claim, plaintiff argues that Gilbert intentionally denied critical intensive case management to Buchanan while providing that service to other high-risk mental health clients living in a community setting.  He also argues that Buchanan did not receive the services to which he was entitled under the AMHI consent decree while others did get such services.  Our prior analysis largely takes care of this issue, but we go on to discuss plaintiff's claim in the equal protection framework, which is different from the ADA method of analysis.

Plaintiff's broad equal protection claims are insufficient; the more specific claim is that Buchanan did not receive a team-produced ISP, while other high-risk patients did. From this, plaintiff argues, one must necessarily conclude the reason for the difference was that Gilbert felt animus for Buchanan.

We repeat the district court's entirely correct explanation of the law with respect to "class of one" claims:

---

[14]    This case does not present any question of effective communication with hearing-impaired persons in emergency treatment situations.  See 34 C.F.R. § 104.52(c).

> A "class of one" equal protection claim exists "where the plaintiff alleges that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." While the United States Supreme Court has recognized the propriety of "class of one" equal protection claims, the viability of such a claim depends upon a showing that the plaintiff was intentionally treated differently than others <u>similarly</u> <u>situated</u>.

<u>Buchanan</u>, 417 F. Supp. 2d at 37 (alteration in original) (citation and footnote omitted) (quoting <u>Village of Willowbrook</u> v. <u>Olech</u>, 528 U.S. 562, 564,(2000)). In general terms, a plaintiff not relying on "typical" impermissible categories, such as race or religion, must show that he was intentionally treated differently from others similarly situated, that no rational basis exists for that difference in treatment, and that the different treatment was based on a malicious or bad faith intent to injure. See <u>Tapalian</u> v. <u>Tusino</u>, 377 F.3d 1, 5 (1st Cir. 2004).

The district court correctly held that there was no evidence Buchanan had been treated differently from others similarly situated. See <u>Buchanan</u>, 417 F. Supp. 2d at 38 (finding no evidence showing that Buchanan was treated differently from Gilbert's other clients or AMHI class members enrolled in the Intensive Case Management program). "Plaintiffs claiming an equal protection violation must first 'identify and relate <u>specific instances</u> where persons <u>situated similarly in all relevant aspects</u> were treated differently, instances which have the capacity to

-41-

demonstrate that [plaintiffs] were singled . . . out for unlawful oppression.'" Rubinovitz v. Rogato, 60 F.3d 906, 910 (1st Cir. 1995) (alteration and omission in original) (emphasis added) (quoting Dartmouth Review v. Dartmouth Coll., 889 F.2d 13, 19 (1st Cir. 1989), overruled on other grounds by Educadores Puertorriqueños en Acción v. Hernández, 367 F.3d 61 (1st Cir. 2004)).

Plaintiff has failed to show any "specific instances" involving similarly situated individuals -- that is, clients who had severe mental health problems similar to Buchanan's, who had declined to participate in the ISP process, but who nevertheless received team-produced ISPs. Instead, plaintiff broadly refers to well over four-hundred pages of the record as supporting the plaintiff's general claim that "high-risk mental health clients received a team produced [ISP] where as [sic] Michael Buchanan didn't." It is true that an exact correlation need not exist between a plaintiff's situation and that of others in order to make a "similarly situated" comparison, see Dartmouth Review, 889 F.2d at 19, but plaintiff's claim is far from adequate.

As is clear from our discussion, Gilbert was entitled to summary judgment because plaintiff failed to establish a viable equal protection claim.[15]

---

[15] Plaintiff consented to summary judgment in favor of Gilbert's supervisor, Julianne Edmondson, on his equal protection claim. Buchanan v. Maine, 417 F. Supp. 2d at 36 n.17.

## III.

The district court's entry of judgment in favor of defendants Lincoln County, Deputy Emerson, Deputy Hatch, and Case Manager Gilbert is affirmed. Judgment for the State of Maine shall be entered on the basis that no Title II claim has been made out. No costs are awarded.